STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
ADAM P. SCHLEIFER (Cal. Bar No. 313818)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephones:(213) 894-5423, 4849
    Facsimile: (213) 894-6269
    E-mails:   kerry.l.quinn@usdoj.gov;
               adam.schleifer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>MAHER OBAGI and MOHAMED SALAH,<br><br><br>          Defendants. | No. CR 13-001(c)-DOC-2,6<br><br>GOVERNMENT'S TRIAL MEMORANDUM<br><br>Trial Date:  August 22, 2022<br>Trial Time:  8:30 a.m.<br>Location:    Courtroom of the<br>             Hon. David O.<br>             Carter |

     Plaintiff, United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Kerry L. Quinn
and Adam P. Schleifer, hereby files its Trial Memorandum for the
above-captioned case.

I.   **INTRODUCTION**

Trial is scheduled for defendants MAHER OBAGI ("OBAGI") and MOHAMAD SALAH ("SALAH") on August 22, 2022.  Defendants OBAGI and SALAH are charged with conspiracy to commit bank fraud and wire fraud in violation of 18 U.S.C. § 1349.  Defendant OBAJI is also charged with three counts of wire fraud in violation of 18 U.S.C. § 1343.  These charges are contained in a Second Superseding Indictment ("SSI") filed on April 13, 2022 (Dkt. No. 763).

II.  **PRELIMINARY MATTERS**

A.   **Trial Length**

The government estimates that its case-in-chief, excluding opening, jury selection, jury instruction, arguments, and defense witnesses, will last approximately 4-5 court days.  The government intends to call approximately 10 witnesses, as set forth in the witness list filed on August 19, 2022 (Dkt. No. 840).  The government intends to present approximately 150 exhibits, which consist primarily of bank records, loan documents, escrow files, email correspondence, summary charts, and audio recordings and transcripts.

B.   **Pre-Trial Motions**

The parties filed several motions in limine, and defendants also raised objections to the government's proposed Bruton redactions of defendants' inculpatory statements.  A summary of those motions and objections and the Court's rulings on those motions and objections is below.  (See also Docket No. 829.)

Defendant OBAGI filed a motion to admit a hearsay statement of a fugitive co-defendant Wajieh Tbakhi ("Tbakhi") (Docket Nos. 776, 784), and the Court granted that motion.  (Docket No. 829.)  The government filed a responsive motion (Docket No. 789) to admit

2

additional Tbakhi statements to impeach the declarant and the meaning defendant Obagi wants to ascribe to the statements he is seeking to admit.

Defendant OBAGI filed a motion _in limine_ to exclude certain bank record summary exhibits (Trial Exhibits 8, 9, and 13) (Docket Nos. 780, 785), and the Court granted the motion in part with respect to the exhibits in their then-current form.  (Docket No. 829.)  The government has modified those exhibits in light of the Court's ruling, and the parties have continued to meet and confer regarding these exhibits.  As of the date of this filing, the government believes defense objections to Exhibit 13 have been resolved, but the parties have an ongoing dispute concerning Exhibits 8 and 9, but will continue to meet and confer to see if defense objections can be resolved.

Defendants objected to the government's proposed _Bruton_ redactions, objecting to the use of a generic pronoun or category as a substitution for the co-defendant's name.  (Docket Nos. 810, 818.) The Court ordered the government to replace generic pronouns with anonymized identifiers specific to each of the other co-defendants, such that the government should reference three different co-defendants as "Person 1, Person 2, and Person 3."  (Docket No. 829.)

The government filed a motion _in limine_ to preclude evidence of or arguments about alleged lender negligence and other types of "blame the lender" defenses.  (Docket Nos. 778, 789.) The Court granted the motion in part, ruling "Defense is precluded from introducing evidence or argument of alleged negligence, recklessness, or even intentional disregard of misrepresentations by the specific lenders in this case," but it also ruled "Defense can introduce

1    evidence of general lending standards in the mortgage industry to

2    disprove materiality or intent to defraud.  The Defense can also use

3    evidence general and specific lending practice for the limited

4    purpose of attacking a witness's credibility on cross examination."

5    (Docket No. 829.)

6         The government moved to admit testimony of three unavailable

7    witnesses, Robert Dearstyne, Mohamed El Tahir, and John Shubash,

8    through the reading of transcripts of their testimony at the first

9    trial in this matter in 2015.  (Docket No. 779, 794.)  Defense agreed

10   to the admission of Shubash's testimony, provided additional cross

11   examination was admitted from the second trial in this matter in

12   2016.  The government did not object to the admission of the

13   additional cross examination, and the Court ruled, without objection,

14   Shubash's testimony and the additional cross examination could be

15   read to the jury.  The Court also granted the government's motion to

16   admit the testimony of the other unavailable witnesses, but invited

17   defendants to "challenge El-Tahir's testimony anew in this trial."

18   Defendants then filed a motion to admit statements El Tahir made in

19   an interview in 2014. (Docket No. 831 at 4.)  The government has

20   responded by seeking admission of additional statements from the same

21   declarant.  (Docket Nos. 837 & 838.)

22   **III. STATEMENT OF CHARGES, ELEMENTS & PRIOR PROCEEDINGS**

23        Count 1 charges defendants OBAGI and SALAH with conspiracy to

24   commit bank and wire fraud in violation of 18 U.S.C. § 1349, which

25   has the following elements: (1) on the dates set forth in the

26   Indictment, there was an agreement between two or more persons to

27   commit the crimes of bank fraud or wire fraud or both; and (2) the

28   defendant became a member of the conspiracy knowing of at least one

4

of its objects and intending to help accomplish it, with all jurors agreeing on what object the defendant agreed to help accomplish.  The elements of bank fraud are: (1) the defendant knowingly carried out a scheme or plan to obtain money or property from financial institutions by making false promises or statements; (2) the defendant knew that the statements or promises were false; (3) the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property; (4) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (5) the financial institutions were federally chartered or insured.  The elements of wire fraud are listed below.

Counts 2 through 4 charge defendant OBAGI with wire fraud in violation of 18 U.S.C. § 1343, which has the following elements: (1) defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendants acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendants used or caused to be used, the wires in interstate or foreign commerce to carry out or attempt to carry out an essential part of the scheme.

The original indictment charged six defendants: OBAGI, SALAH, Momoud Aref Abaji ("Abaji"), Tbakhi, Jacqueline Burchell ("Burchell") and Mohamad El Tahir ("El Tahir").  In a related case, defendant Ali Khatib ("Khatib") pled guilty to bank fraud in violation of 18 U.S.C.

§ 1344.  Following the indictment in this case, defendants Burchell and El Tahir entered into plea agreements with the government and plead guilty to crimes related to the mortgage fraud scheme, with defendant Burchell pleading guilty to conspiracy to commit bank fraud and wire fraud, and defendant El Tahir pleading guilty to wire fraud. Defendant Tbakhi fled to Jordan to avoid prosecution and is still a fugitive.  Defendant El Tahir was killed in an unrelated incident.

On March 27, 2015, following a three-week jury trial, defendant OBAGI and SALAH were convicted of conspiracy to commit bank and wire fraud, and defendant OBAGI was also convicted of multiple counts of wire fraud.  (Docket No. 258.)  On February 5, 2016, following a separate trial, defendant Abaji was convicted of the conspiracy count, multiple counts of wire fraud, and tax offenses.  (Docket No. 354.)  All three defendants appealed, and while the Ninth Circuit affirmed Abaji's conviction, it reversed OBAGI's and SALAH's convictions and remanded for a new trial.  Retrial is scheduled for August 22, 2022.

## IV.   STATEMENT OF FACTS

### A.   Background

The SSI describes how the fraud scheme worked.  From 2007 to 2009, defendants ran a "builder bailout" fraud from offices in Orange County.  They ran this fraud through companies called Excel Investments, Faris Realty, and Event Marketing, among others (collectively "Excel").  In the course of the fraud, defendants identified condominium projects, including properties in Florida, California, and Arizona, in which builders were struggling to sell units in projects that had been built prior to the 2008 financial crisis.  Defendants negotiated large kickbacks from the builders

6

(sometimes 30-40% of the purchase price) in exchange for the purchase of multiple condominium units.  The builders would pay this kickback to defendants' companies when the sale of the units closed, effectively reducing the purchase price defendants paid for the units.  Defendants concealed the nature of these kickbacks or discounts by describing the payments in contractual agreements with builders as "marketing fees" or "commissions" instead of what they really were -- that is, per-unit cash kickbacks, representing the difference between the inflated list prices disclosed to the lenders and the real prices builders actually received on the units.

Once defendants had agreements in place with the builders, they recruited buyers, including themselves, their close relatives, and other individuals with good credit scores (collectively, "straw buyers") to purchase properties.  In pitching the "investment" to straw buyers, defendants promised no down payments or mortgage payments (or any other payments) for more than a year, and they also promised that defendants would find renters for the properties and manage the properties for the straw buyers, with no upfront obligations on behalf of the straw buyers, and instead straw buyers would get an upfront payment for participating in the investment. The benefit to the straw buyer was both the upfront money at the time of closing, as well as possible profit when the properties were resold in the future.

Defendants prepared the loan applications to be submitted for the straw buyers, inventing fictional employment, income, and assets for the straw buyers in order to qualify them for loans.  The defendants used the straw buyers' real names and social security numbers but falsified nearly every other aspect of the applications,

including the purchase price listed for the property and
representations regarding use of the properties as second homes.
Defendants also fabricated fraudulent documents to support the false
statements, including forged W-2 tax forms, pay stubs, and bank
statements.  They further represented to lenders that buyers had
contributed significant down payments to purchase properties when, in
fact, the straw buyers contributed nothing at all, and the down
payment was fabricated and either supplied by one of defendants'
companies out of kickback money or netted out of the closing money by
the complicit escrow officer.  In order to maximize the number of
properties each straw buyer could purchase, defendants simultaneously
submitted, on behalf of each straw buyer, multiple loan applications
for multiple properties to different lenders, allowing their
approximately 50 "investor" straw buyers to purchase more than 100
total properties.

Defendants also concealed the kickbacks from builders by
omitting any reference to the kickbacks on documents that lenders
received.  Thus, defendants did not send lenders addendums to
purchase agreements showing the discounts to purchase prices they
negotiated, and they did not disclose the kickbacks on the HUD-1
settlement statements ("HUD-1s") lenders received from escrow.  At
defendant OBAGI's direction, Burchell, the escrow officer,
facilitated the scheme by creating two versions of the HUD-1s.  The
false HUD-1s, labeled "estimated," would conceal the significant cash
kickbacks that defendants were receiving from builders.  In many
transactions, the kickbacks totaled $50,000 to $100,000 or more, on
properties whose list price was less than $300,000.  Burchell would
provide the false HUD-1s to lenders at closing.  Immediately after

the deal closed, or as she was preparing to close, Burchell would alter the "estimated" HUD-1 to create an accurate, "final" HUD-1, which she maintained in her files, but did not disclose to lenders. If lenders requested final HUD-1s, Burchell ignored the requests.

In addition to supervising the escrow officer, defendant OBAGI prepared and supervised the preparation of the fraudulent loan applications submitted as part of the fraud.  The co-conspirators -- with the assistance of software obtained for this purpose -- figured out the specific fake information that needed to be listed on loan applications for lenders to approve the loans, and defendant OBAGI, with the assistance of others at Excel, then invented fictious employment, income, and assets for the straw borrowers, and down payments they did not make, to be able to get the loans approved.  On the applications, defendant OBAGI listed cell phone numbers of phones that he and other co-conspirators controlled as numbers for the borrowers and for the borrowers' supposed employers, and he, along with defendants Abaji and Salah, pretended to be borrowers and employers when lenders called to verify information.  They also supervised some of the female office workers in pretending to be female borrowers.  Defendant OBAGI further supervised El Tahir and Salah in the work they did, including work El Tahir did in preparing and submitting fraudulent loan applications, which included the preparation of the loan applications themselves and the creation of fake companies to list as employers -- which itself including creating yellow page listings or internet sites or populating information on existing internet sites to make it appear the fake companies were real.  With regard to SALAH, OBAGI supervised him in the creation of the fake financial records to submit with loan

applications.  Defendant OBAGI and his family also profited
substantially from the fraud: OBAGI received more than $254,000 in
kickbacks from condominium units purchased in his name and his
brother's name, and he and Abaji received more than $892,000 in total
in proceeds from the scheme.

For his part in the scheme, defendant SALAH prepared the fake
W2's, payroll stubs, and other financial documents such as bank
statements to be submitted along with loan applications, and he, like
defendant OBAGI pretended to be borrowers and employers when lenders
called to verify information.  He also laundered hundreds of
thousands of dollars in loan proceeds.

Evidence establishing these facts will include the testimony of
Burchell and El Tahir, who are cooperating defendants, testimony of
office workers, summaries of bank records, examples of the fraudulent
loan applications and forged financial records, including loan
applications submitted in OBAGI's name and in the names of the other
straw buyers, including Robert Dearstyne and John Shubash, whose
loans are identified in the wire fraud counts.  It will also include
defendants' own statements to law enforcement and SALAH's recorded
conversation with Khatib, who was cooperating with law enforcement at
the time.

**V.   EVIDENTIARY AND TRIAL ISSUES**

**A.   Authentication and Foundation**

Federal Rule of Evidence 901(a) provides that "[t]he requirement
of authentication or identification as a condition precedent to
admissibility is satisfied by evidence sufficient to support a
finding that the matter in question is what its proponent claims."
Under Rule 901(a), evidence should be admitted, despite any

10

challenge, once the government makes a prima facie showing of
authenticity or identification so "that a reasonable juror could find
in favor or authenticity or identification . . . [because] the
probative force of the evidence offered is, ultimately, an issue for
the jury." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir.
1991) (citations and internal quotation marks omitted); see also
United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

**B. Stipulations**

The parties have entered into stipulations on the interstate
nature of the charged wire transfers and on the English-language
translation of a recording of a call between Khatib and SALAH.
(Docket Nos. 842 & 843.)

**C. Business Records and Certification**

The government will seek the admission of business records from
(among others) banks, mortgage lenders, and escrow agent custodians
as self-authenticating business records pursuant to Fed. R. Evid.
902(11). The government has provided defense counsel with an index
of these business records and business records summarized in the
government's summary exhibits, cross-referenced with the relevant
custodian declarations and certifications, that the government will
seek to admit without further testimony at trial. The government
will be seeking to admit these exhibits without further testimony
from custodians.

**D. Public Records**

Public records and reports are admissible under an exception to
the hearsay rule. Fed. R. Evid. 803(8). The contents of an official
public record that is certified as correct may be proved by a copy,
and may be proved by a copy without extrinsic evidence of

11

1    authentication as long as the copy bears a seal of the United States,

2    any state, or department thereof.  Fed. R. Evid. 1005; 902(1).  The

3    government will be seeking to admit certain documents under the

4    public records exception to the hearsay rule or summaries of those

5    records.

6         **E.   Charts and Summaries**

7         Rule 1006 of the Federal Rules of evidence permits a proponent

8    to "use a summary, chart, or calculation to prove the content of

9    voluminous writings, recordsing, or photographs that cannot be

10   conveniently examined in in court."  Fed. R. Evid. 1006; United

11   States v. Wood, 943 F.2d 1048, 1053 (9th Cir. 1991).  Under this

12   rule, charts or summaries may be admitted as evidence where the

13   proponent establishes that the underlying documents are voluminous,

14   admissible, and available for inspection.  See United States v.

15   Meyers, 847 F.2d 1408, 1411-12 (9th Cir. 1988); United States v.

16   Johnson, 594 F.2d 1253, 1255-57 (9th Cir. 1979).  While the

17   underlying documents must be admissible, they need not be admitted.

18   Meyers, 847 F.2d at 1412.  Summary charts need not contain the

19   defendant's versions of the evidence and may be given to the jury

20   while a government witness testifies about them.  See United States

21   v. Radseck, 718 F.2d 233, 239 (7th Cir. 1983); Barsky v. United

22   States, 339 F.2d 180, 181 (9th Cir. 1964).

23        The summary exhibits the government will seek to admit in this

24   case will concisely summarize voluminous bank records, loan

25   documents, escrow records, and property records, all of which have

26   been previously provided to defense counsel in discovery and

27   identified by specific exhibit numbers.  United States v. Rizk, 660

28   F.3d 1125, 1130-31 (9th Cir. 2011).  It would be time-consuming and

                                     12

tedious, and not conducive to ready comprehension of information, to present each of these documents in individual form to the jury, and would basically obscure the forest through the trees and leaves.  Id. ("the purpose of [Fed. R. Evid. 1006] is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury") (internal quotations omitted).  All of the documents that support these summary exhibits would be admissible at trial.  The government will seek to admit some, but not all, of those documents.  Rizk, 660 F.3d at 1130 ("it is essential that the underlying records from which . . . summaries are made be admissible in evidence, and available to the opposing party for inspection, but the underlying evidence does not itself have to be admitted in evidence and presented to the jury").

**F.   Audio Recording and Transcript**

On May 30, 2011 defendant SALAH made a statement in a recorded conversation with Khatib, who was a cooperating witness at the time (the recording has been marked as Exhibit 121.)  This conversation takes place in both Arabic and English.  The parts in Arabic have been translated by an FBI linguist.  The government will play this recording for the jury and, for the Arabic parts, ask for them to accept, as evidence, an accompanying English transcript.  United States v. Franco, 136 F.3d 622, 626 (9th Cir. 1998) (recognizing that in the case of foreign language recordings, "a jury is not free to disagree with a translated transcript . . . the transcripts substitute for the tapes").  The government will seek to admit this English transcript and have the jury receive it during deliberation (the transcript has been marked as Exhibit 122).

13

1

### G.   Expert Testimony

2    A qualified expert witness may provide opinion testimony on the

3    issue in question if specialized knowledge will assist the trier of

4    fact. Fed. R. Evid. 702.  The government has noticed and intends to

5    introduce expert testimony from Nicole Fox, a Customer Account Risk

6    Manager/Quality Control Specialist at the Federal National Mortgage

7    Association ("Fannie Mae").  Ms. Fox has approximately twenty years

8    of experience working in the field of residential mortgages, with

9    that time divided roughly evenly between work for mortgage

10   underwriters including the lender formerly known as ING Direct, and

11   work at Fannie Mae consulting with lenders on best practices to

12   mitigate residential loan risk and, when necessary, identifying loans

13   with inaccuracies requiring the banks to repurchase them from Fannie

14   Mae.  Ms. Fox will testify that inaccuracies and misstatements on

15   loan applications and supporting documents going to the identity,

16   employment, income, net assets, and liabilities of mortgage borrowers

17   as well as to the intended use and price of the properties serving as

18   collateral for mortgages would all affect the underwriting process,

19   i.e., would be material information to such lenders.

20   Defendant OBAGI has also noticed two expert witnesses.  One is a

21   handwriting expert proffered to testify that numerous signatures

22   purporting to be defendant OBAGI's in loan applications in defendant

23   OBAGI's name were not in fact signed by defendant OBAGI.  The other

24   is an Arabic-language translator proffered to testify regarding

25   defendant OBAGI's Syrian passport and specifically certain stamps on

26   the passport in Arabic suggesting he was in Syria for a few weeks in

27   the fall of 2008.  The government respectfully reserves the right to

28

object to the admission of testimony from these or other defense proffered experts, under Fed. R. Evid. 401, 403, and 702, in alia.

## H.   Defendants' Statements

The government will seek to introduce certain statements made by defendant. These statements are admissible as "admissions by a party opponent."  See Fed. R. Evid. 801(d)(2)(A); United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981).

### 1.   Interviews

Defendant OBAGI was interviewed on January 12, 2012.  Defendant SALAH was interviewed on October 12, 2011.  The government plans to call an agent that conducted the interviews to testify about what defendants said in those interviews.

### 2.   Written Statements

The government also intends to admit written statements made by the defendants and their co-conspirators, including but not limited to statements in loan applications and emails, and other various documents provided in discovery.

## I.   Co-Conspirator Statements

Though the majority of testimony will concern witnesses' direct experiences with defendants and statements defendants themselves made to the witnesses, the government anticipates some testimony and exhibits will relate to statements of co-conspirators made in furtherance of the conspiracy.  "Once a conspiracy is shown, the government need present only slight evidence connecting a defendant to the conspiracy."  United States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1988).  This burden is easily met: for example, the Ninth Circuit deemed adequate the fact that a defendant had met with another individual shortly before the latter sold drugs to an

undercover agent.  See <u>United States v. Paris</u>, 812 F.2d 471, 476 (9th Cir. 1987).  Co-conspirator statements themselves may be used to establish the existence of a conspiracy even before some separate evidence has proved the conspiracy's existence.  <u>Bourjaily v. United States</u>, 483 U.S. 171, 180 (1987).

The Ninth Circuit has held Rule 802(d)(2)(E)'s requirement that co-conspirator statements be made "in furtherance" of a conspiracy to be broadly inclusive.  It encompasses, "[m]ost importantly, statements made to keep coconspirators abreast of an ongoing conspiracy's activities."  <u>United States v. Yarborough</u>, 852 F.2d 1522, 1535 (9th Cir. 1988).  In addition to statements apprising co-conspirators of the activities of other co-conspirators, <u>Yarborough</u> held that the following capacious categories of statements also qualify as furthering the conspiracy: statements made to "set in motion transactions that are an integral part of the conspiracy," statements "made to induce enlistment or further participation" in the conspiracy, and statements intended to "prompt further action."  <u>Id.</u>

**J.   Reciprocal Discovery**

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery obligations on the part of the defendants to produce three categories of materials that they intend to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure.  In those circumstances where a party fails to produce discovery as required by Rule 16, the Rule empowers the

16

1 | district court to "prohibit the party from introducing evidence not
2 | disclosed," or "enter such other order as it deems just under the
3 | circumstances."

4 |     The Ninth Circuit has held that where a defendant fails to
5 | produce reciprocal discovery or fails to provide timely notice of his
6 | intention to call an expert witness, it is well within the district
7 | court's discretion to exclude such defense evidence, especially where
8 | the defense disclosure was made after the start of trial.  See United
9 | States v. Aceves-Rosales, 832 F.2d 1155, 1156-57 (9th Cir. 1987);
10 | United States v. Scholl, 166 F.3d 964, 972 (9th Cir. 1999); United
11 | States v. Nash, 115 F.3d 1431, 1439-40 (9th Cir. 1997).  The Ninth
12 | Circuit has specifically held that exclusion of the evidence is a
13 | proper sanction for withholding evidence from the government as a
14 | "strategic decision."  United States v. Scholl, 166 F.3d 964 (9th
15 | Cir. 1999) (holding that the court did not abuse its discretion in
16 | excluding evidence that the defense withheld as a 'strategic
17 | decision' until the government was unable to fully investigate).

18 |     Defendants have not provided reciprocal discovery, although they
19 | have marked certain documents as Exhibits at prior proceedings in
20 | this case.

21 | **K.   Cross-Examination of Defendant**

22 |     A defendant who testifies at trial waives his right against
23 | self-incrimination and subjects himself to cross-examination
24 | concerning all matters reasonably related to the subject matter of
25 | his testimony.  See, e.g., Ohler v. United States, 529 U.S. 753, 759
26 | (2000) (citing McGautha v. California, 402 U.S. 183, 215 (1971),
27 | vacated in part on other grounds, 408 U.S. 941 (1972) ("It has long
28 | been held that a defendant who takes the stand in his own behalf

17

1  cannot then claim the privilege against cross-examination on matters

2  reasonably related to the subject matter of his direct

3  examination.")).  A defendant has no right to avoid cross-examination

4  on matters which call into question his claim of innocence.  United

5  States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

6  Thus, should either of the defendants choose to testify in his own

7  defense, the government will seek to cross-examine defendantsabout

8  their participation in the charged mortgage fraud scheme and their

9  prior admissions to co-conspirators and law enforcement.

10  **VI.   Trial Filings**

11     **A.   Exhibit List**

12     The government respectfully requests the Court provide the jury

13  a copy of the Government's Exhibit List for use in deliberations.

14     **B.   Jury Instructions**

15     The parties have submitted a joint set of agreed-upon jury

16  instructions.  (Docket No. 808.)  The government filed additional

17  proposed government jury instructions (Docket No. 809), to which

18  defense has objected (Docket No. 815).  And defendant OBAGI filed

19  additional proposed defense jury instructions (Docket No. 811), to

20  which the government objected (Docket No. 813).

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

**VII. CONCLUSION**

The government may provide supplemental briefing to the Court during the course of trial should unexpected issues arise.

Dated: August 19, 2022         Respectfully submitted,

                               STEPHANIE S. CHRISTENSEN
                               Acting United States Attorney

                               SCOTT M. GARRINGER
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               KERRY L. QUINN
                               ADAM P. SCHLEIFER
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA